## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 28 2017, 6:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jason K. Jones,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 28, 2017<br><br>Court of Appeals Case No.<br>73A01-1702-CR-208<br><br>Appeal from the Shelby Superior Court<br><br>The Honorable David N. Riggins, Judge<br><br>Trial Court Cause No.<br>73D02-1507-F1-2 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a bench trial, Jason Jones was convicted of rape, a Level 1 felony; intimidation using a deadly weapon and criminal confinement, both Level 5 felonies; and criminal recklessness while armed with a deadly weapon, strangulation, and domestic battery in the presence of a child less than sixteen years of age, all Level 6 felonies. Jones was sentenced to twenty years in the Indiana Department of Correction. Jones now appeals his conviction of rape, alleging there was insufficient evidence that Jones compelled the sexual contact by threatening the use of deadly force. He also appeals his convictions for rape and criminal confinement, alleging the two convictions were based on the same confining force and therefore, convictions for both violate principles of double jeopardy. Concluding there was sufficient evidence of rape as a Level 1 felony and Jones's convictions of both rape and criminal confinement do not constitute double jeopardy, we affirm.

# Facts and Procedural History

[2] After having been married for eleven years and having two children together, Jones and B.J. divorced in June 2015. Although Jones received the parties' house in the divorce and had physical custody of the children during the school year, Jones and B.J. continued living in the house together with the children, aged fourteen and nine.

[3] In the early morning hours of July 25, 2015, B.J. returned home after having been out drinking with a friend named Jeremi and others, celebrating Jeremi's birthday. Jones was in the garage working on his motorcycle. Jones questioned B.J. about where she had been, who she had been with, and whether she had been drinking. B.J. described Jones as not "happy about that." Transcript, Volume 1 at 197. They began to argue, and B.J. began to record the argument with her cell phone, a tactic she had used in the past. The audio recording was introduced into evidence at trial. One of the children entered the garage during the argument and Jones yelled at him to go back to bed. Jones began throwing B.J.'s possessions out of the garage and repeatedly told B.J. to leave, making threats of physical harm to Jeremi and asking her to call him. B.J. initially refused to contact Jeremi but she eventually conceded and texted Jones's phone number to Jeremi and asked Jeremi to call Jones. When Jeremi failed to call, Jones took his gun and set out to find Jeremi.[1] Jones, who had never met Jeremi texted B.J. to ask what Jeremi looked like after he left.

[4] Apparently unable to find Jeremi, Jones returned home and immediately began yelling at B.J., so she again began recording the interaction. This audio recording was also admitted into evidence at trial. Jones left the garage to take the license plate off B.J.'s car, and B.J. went into the house and locked the doors. When she heard Jones yelling, she went back into the garage and found

---

[1] B.J. told Jones she had last been at the Knock Em Back Pub. Presumably, Jones went there to try to find Jeremi.

Jones on the phone with Jeremi, pacing and yelling at him, calling him profane names. While Jones continued to yell at Jeremi over the phone, he and B.J. also argued and insulted each other. While B.J. was standing approximately three feet from him, Jones raised his gun, aimed it at B.J.'s face, told Jeremi, "[s]he's about to get shot," and shot his gun into the garage wall behind B.J. *Id.* at 218. B.J. tried to escape back into the house, but Jones followed her into the kitchen.

[5] Jones grabbed B.J. by the throat with his right hand. B.J. grabbed a handful of Jones's beard. He told her to let go of him and she replied, "[w]ell, let go of me." *Id.* at 221. Jones told B.J. he was going to "beat the sh*t out of you, b*tch. I'm gonna f***ing kill you," *id*. at 270-71, and pushed her to the floor, holding her down with his right hand which was still around her throat, exerting pressure so that she had a hard time breathing. While on top of B.J., Jones pulled B.J.'s pants and underwear down with his left hand and put two fingers in her vagina, whilst saying, "This is what you want, isn't it?" *Id.* at 225. B.J. just kept repeating, "Get off me," *id.* at 227, and trying to claw at him, eventually losing one of her artificial nails in the endeavor. At some point, their son entered the room and yelled, "no[!]" *Id.* at 224. B.J. grabbed a bottle of insect spray that was nearby and hit Jones in the head with it. He told B.J. "you're about to die," Tr., Vol. 2 at 278, then took his hand off B.J.'s throat and got up. B.J. pulled the knife she always carries from her pocket, told Jones to "[g]o to hell," and called 911. Tr., Vol. 1 at 224. Jones told B.J. to get out of his house and went outside. She testified at trial that she felt "terrified" and

"violated" by the incident; "terrified" because she thought Jones was going to follow through on his threat to kill her and "violated" because she did not ask Jones to touch her sexually. Tr., Vol. 1 at 230-32. The audio tape reveals several tumultuous seconds from the time the parties entered the house until Jones left.

[6] Deputy Chris Clark of the Shelby County Sheriff's Department responded to the 911 call. Deputy Clark first encountered Jones outside the house. Jones admitted he and B.J. had an argument that turned physical. Deputy Clark then spoke to B.J., who was "upset a little." Tr., Vol. 2 at 349. B.J. told Deputy Clark that Jones had "violated" her, *id.* at 289, and strangled her, but she did not mention a gun. She told Deputy Clark that she had made recordings of the altercation but was unable to find the relevant parts of the recordings. After B.J. was unable to prove the house was her residence, the officer made B.J. leave the premises. She picked up Jeremi and stayed with him until approximately five o'clock in the evening on July 25, when they went to the Sheriff's Department to make a report. During her conversation with officers that evening, she was able to play the recordings, and she relayed the gun incident, the strangulation, and the rape. B.J. then went to the hospital for an examination. The forensic nurse documented B.J.'s injuries, although she did not do a physical examination of or take samples from B.J.'s genital area. B.J. told the nurse she and Jones last had consensual intercourse two or three days before this incident. The nurse told her the forensic evidence from such an examination would therefore be inconclusive, and B.J. declined the

examination. The nurse nonetheless documented bruises to B.J.'s neck, wrist, upper torso, right knee, and a toe on her right foot.

[7] After speaking with B.J., officers from the Shelby County Sheriff's Department obtained and executed a search warrant at Jones's home. The police recovered Jones's handgun, B.J.'s broken fingernail, and found a bullet hole in the garage. Although Jones at first told a less-than-forthcoming story, he eventually admitted to threatening B.J., pushing her down, and firing the gun.

[8] The State charged Jones with rape, a Level 1 felony for "knowingly or intentionally caus[ing] another person to perform or submit to other sexual conduct when the other person is compelled by deadly force or the imminent threat of deadly force"; rape, a Level 3 felony for "knowing or intentionally caus[ing] another person to perform or submit to other sexual conduct when the other person is compelled by force or the imminent threat of force"; intimidation with a deadly weapon, a Level 5 felony; intimidation, a Level 6 felony; criminal confinement, a Level 5 felony for "knowingly or intentionally confin[ing] another person without the other person's consent and it resulted in bodily injury to a person other than [Jones]"; pointing a firearm, a Level 6 felony; criminal recklessness, a Level 6 felony; strangulation, a Level 6 felony; domestic battery, a Level 6 felony due to the presence of a child; and domestic battery, a Class A misdemeanor. Appellant's Appendix, Volume II at 32-34. Jones waived his right to a jury trial, and the trial court found him guilty of rape as a Level 1 felony, intimidation, criminal confinement, criminal recklessness, strangulation, and domestic battery in the presence of a child. The court

merged the remaining counts. *See* Tr., Vol. 2 at 417. The court sentenced Jones to twenty years for rape, to be served concurrently with an aggregate of ten years on the remaining counts.

[9] Jones filed a notice of appeal in April 2016. On September 7, 2016, this court issued an order dismissing the appeal without prejudice to allow Jones to pursue Trial Rule 60(B) proceedings in the trial court regarding newly discovered evidence. On September 29, 2016, Jones filed in the trial court a motion for new trial based on newly discovered evidence, alleging B.J. had contacted appellate counsel and recanted her testimony that Jones had raped her. Following a hearing on the motion, the trial court determined Jones had failed to prove he was entitled to relief. Jones then initiated a new appeal, which is now before the court.

# Discussion and Decision

## I. Sufficiency of Evidence

### A. Standard of Review

[10] Jones first contends the evidence was not sufficient to show Jones raped B.J. under an imminent threat of deadly force. He argues his Level 1 felony rape conviction should be reduced to a Level 3 felony.

[11] In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses; instead considering only the evidence most favorable to the judgment and reasonable inferences

therefrom. *Pugh v. State*, 52 N.E.3d 955, 966 (Ind. Ct. App. 2016), *trans. denied*. "We will affirm the conviction if there is probative evidence from which a reasonable [factfinder] could have found the defendant guilty beyond a reasonable doubt." *Dillard v. State*, 755 N.E.2d 1085, 1089 (Ind. 2001). In other words, we will only reverse for insufficiency of the evidence if "no reasonable factfinder could find the defendant guilty." *Griffith v. State*, 59 N.E.3d 947, 958 (Ind. 2016).

## B. Imminent Threat of Deadly Force

[12] Rape is committed when a person knowingly or intentionally causes another person to submit to intercourse or other sexual conduct[2] when the other person is, among other things not relevant here, compelled by force or the imminent threat of force. Rape compelled by force or the imminent threat of force is a Level 3 felony. Ind. Code § 35-42-4-1(a)(1). Based on the standard of review and the evidence adduced at trial, Jones does not challenge that the State proved the Level 3 felony. *See* Brief of Appellant at 11. However, Jones was convicted of rape as a Level 1 felony for "using or threatening the use of *deadly force*" in committing the crime. Ind. Code § 35-42-4-1(b)(1) (emphasis added).[3] Jones challenges the sufficiency of the evidence showing that he used or

---

[2] "Other sexual conduct" is defined by Indiana Code section 35-31.5-2-221.5 as an act involving "the penetration of the sex organ or anus of a person by an object."

[3] Rape can also be elevated to a Level 1 felony if committed while armed with a deadly weapon. Ind. Code § 35-42-4-1(b)(2). The State conceded that it did not charge Jones pursuant to this provision because B.J. did not know what Jones did with the gun after shooting it at her in the garage. Tr., Vol. 2 at 374.

threatened use of deadly force in compelling B.J. to submit to the sexual conduct because an isolated threat to kill B.J. was not sufficiently connected to the sexual assault. The State argues the evidence shows "multiple examples of threats, or uses, of deadly force" by Jones during the sexual assault of B.J. Brief of Appellee at 17.

[13] "A threat of deadly force is sufficient if it is imminent enough to cause the victim to submit to the aggressor. It is not necessary that the aggressor actually exert the deadly force threatened." *Ford v. State*, 543 N.E.2d 357, 358 (Ind. 1989) (citation omitted). In *Jackson v. State*, 683 N.E.2d 560 (Ind. 1997), the defendant threatened to kill the victim three times and the victim testified she complied with the defendant's demands in part because she was afraid he would kill her. Thus, the threat of deadly force was "integral" to the defendant's ability to subdue the victim and the court held there was sufficient evidence of a threat of deadly force to support the defendant's conviction of attempted rape. *Id.* at 567. In *Pennington v. State*, 523 N.E.2d 414 (Ind. 1988), the defendant made threats to kill the victim both before and during a sexual assault and placed his arms on her torso so that her breathing was impaired, which frightened her. The court held there was ample evidence the defendant made multiple threats and had the ability to carry them out, thereby providing sufficient evidence of threatening the use of deadly force. *Id.* at 415-16.

[14] Here, the evidence reveals Jones compelled B.J. to submit to the sexual conduct against her will by threatening the use of deadly force. Jones told B.J. at least three times in the seconds before and during the assault that he was going to kill

her. He had just brandished and shot a gun, and although B.J. did not know where the gun was at the instant Jones assaulted her, she certainly knew he had access to such a weapon and was willing to use it. In addition, Jones was on top of B.J. with his hand exerting pressure on B.J.'s throat during the assault, making it hard for her to breathe. "Deadly force" is defined by statute as "force that creates a substantial risk of serious bodily injury." Ind. Code § 35-31.5-2-85. In turn, "serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." Ind. Code § 35-31.5-2-292. A gunshot wound or the inability to breathe due to strangulation would easily fall within that definition. As in *Jackson* and *Pennington*, we conclude the evidence here was sufficient to show a threat of deadly force that supports Jones's conviction for rape as a Level 1 felony.

## II. Double Jeopardy

[15]     Jones also argues his convictions and sentences for both rape and criminal confinement run afoul of double jeopardy principles and the criminal confinement conviction should therefore be vacated.

[16]     The analysis of double jeopardy claims under the Indiana Constitution is governed by *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999), in which our supreme court described two tests, the statutory elements test and the actual evidence test. *Wieland v. State*, 736 N.E.2d 1198, 1204 (Ind. 2000). Two

offenses are the "same offense" in violation of Article 1, Section 14 of our constitution if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id.* (quoting *Richardson*, 717 N.E.2d 32) (emphasis omitted). Jones confines his constitutional argument to the actual evidence test.

[17]   Under the actual evidence test, the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. *Vanzandt v. State*, 731 N.E.2d 450, 455 (Ind. Ct. App. 2000), *trans. denied*. To show that two challenged offenses constitute the same offense under the actual evidence test, a defendant must show a reasonable possibility that the evidentiary facts used by the fact finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Wieland*, 736 N.E.2d at 1204. In determining the facts used by the fact-finder to establish the elements of each offense, it is appropriate to consider the charging information, jury instructions, and arguments of counsel. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008).

[18]   In addition to this constitutional protection, our supreme court has long adhered to a series of rules of statutory construction and common law that are often described as double jeopardy but are not governed by the constitutional test. *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002). One of these rules prohibits the "[c]onviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been

convicted and punished." *Richardson*, 717 N.E.2d at 55 (Sullivan, J., concurring).

[19]     Jones was charged with rape for knowingly or intentionally causing B.J. to submit to other sexual conduct when she was compelled by deadly force or the imminent threat of deadly force. He was also charged with criminal confinement for knowingly or intentionally confining B.J. without her consent resulting in bodily injury. As our supreme court has noted in a similar case, "[c]ertainly, one who commits rape or criminal deviate conduct necessarily 'confines' the victim at least long enough to complete such a forcible crime." *Gates v. State*, 759 N.E.2d 631, 632 (Ind. 2001). The question is "whether the confinement exceeded the bounds of the force used to commit the rape[.]" *Id.* On this record, we conclude that the State established that Jones's confinement of B.J. exceeded the bounds of the force he used during the rape.

[20]     Jones argues his rape conviction is based on evidence that he "was on top of B.J. for less than a minute while he stuck his fingers inside her vagina [and n]o other evidence suggests Jones confined B.J. for any other time period." Br. of Appellant at 16. He argues the two convictions for rape and criminal confinement were therefore based on "the same confining force." *Id.* at 14.

[21]     In *Jacobs v. State*, 2 N.E.3d 116, 122-23 (Ind. Ct. App. 2014), *summarily aff'd on this issue*, 22 N.E.3d 1286 (Ind. 2015), the State alleged that the defendant committed criminal deviate conduct while on top of the victim and that the defendant got off the victim when the sexual act concluded. The State

conceded the defendant's convictions for both criminal deviate conduct and criminal confinement constituted double jeopardy, and concluding the defendant "did not use more force than was necessary to commit criminal deviate conduct," we agreed and vacated the criminal confinement conviction. *Id.* at 123. Jones argues the same is true here, and points to the State's closing argument, during which the prosecutor stated, "in terms of the confinement, you have the fact that he was on top of her in the, basically, the kitchen area." Tr., Vol. 2 at 392.

[22] The State presented evidence that Jones followed B.J. into the house after shooting the gun into the garage wall and grabbed her by the throat. In return, B.J. grabbed Jones by the beard, and the two bickered back and forth for several seconds about each letting go. Jones did not let go, and instead, kept his hand on B.J.'s throat as he pushed her to the floor, where he then compelled her to submit to other sexual conduct.

[23] At closing argument of the trial, the State only mentioned the time Jones was on top of B.J. in relation to the criminal confinement charge – a fact the State concedes on appeal. However, this was a bench trial, and we presume the trial court knows and follows the applicable law. *Thurman v. State,* 793 N.E.2d 318, 321 (Ind. Ct. App. 2003). In the absence of any indication to the contrary, we presume the trial court used the appropriate evidentiary facts as the basis for the separate convictions. *Cf. Alexander v. State*, 768 N.E.2d 971, 977-78 (Ind. Ct. App. 2002) (finding a double jeopardy violation after bench trial, where, among other things, the trial court's statements indicated it had relied on the same

evidence to sustain two convictions). Here, the trial court made no specific statement regarding its guilty findings, and there was evidence that Jones confined B.J. by restricting her movement prior to the time he was on top of her and committing the sexual assault. We therefore hold there was not a reasonable possibility that the trial court used the same facts to establish the elements of both rape and criminal confinement.

[24] For the same reasons we do not believe there is a reasonable possibility the two convictions are based upon the same actual evidence, we do not think the criminal confinement conviction is based on the "very same act" as an element of the rape conviction. Therefore, the criminal confinement conviction does not fall under the common law category of double jeopardy prohibiting "[c]onviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished." *Richardson*, 717 N.E.2d at 55. As Justice Sullivan explained, this category prohibits a conviction that is based on behavior or harm that is coextensive with the behavior or harm necessary to establish an element of another conviction. *Id.* Courts have therefore not vacated convictions "where the subject behavior or harm is either separate from or more extensive than that necessary to constitute the element of the first crime." *Id.*; *see, e.g.*, *Purter v. State,* 515 N.E.2d 858, 860 (Ind. 1987) (affirming rape and confinement convictions because the confinement extended beyond that necessary to establish an element of the rape conviction). Although the behavior here significantly overlapped, there is evidence that the confinement began prior to

the time Jones pushed B.J. to the floor and got on top of her to commit the rape. Therefore, there is evidence the confinement extended beyond that necessary to establish the rape conviction, and there is no common law double jeopardy violation.

# Conclusion

[25] The State presented sufficient evidence that Jones compelled B.J. to submit to sexual conduct by an imminent threat of deadly force, and therefore, Jones's conviction of rape as a Level 1 felony is affirmed. Further, Jones's convictions for rape and criminal confinement do not violate either constitutional or common law double jeopardy principles, and therefore, Jones's conviction for criminal confinement is also affirmed.

[26] Affirmed.

Riley, J., and Pyle, J., concur.